**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**
**BUFFALO DIVISION**

JOSEPH MIRABELLI and LOUIS GONZALEZ III, Individually and on Behalf of All Others Similarly Situated,

Plaintiffs,

v.

APPLE INC.,

Defendant.
_________________________________/

Case No.:

**COMPLAINT AND JURY TRIAL DEMANDED**

**COMPLAINT**

Plaintiffs Joseph Mirabelli and Louis Gonzalez, III ("Plaintiffs"), on behalf of themselves and all others similarly situated, by and through undersigned counsel of record, bring this action against Defendant Apple Inc. ("Apple" or "Defendant"). The allegations contained herein, which are based on Plaintiffs' knowledge of facts pertaining to themselves and their own actions and counsel's investigations, and upon information and belief as to all the other matters, are as follows:

**I. INTRODUCTION**

1. This action is brought on behalf of Plaintiffs, and others similarly situated, that purchased goods sold by Defendant throughout the United States, who bore the economic burden of tariffs imposed by the President Donald Trump ("Trump") Administration under the International Emergency Economic Powers Act ("IEEPA") (50 U.S.C. § 1701, et seq.), and against Defendant who shifted the economic burden of the IEEPA tariffs to consumers throughout the United States by increasing prices on imported goods as well as U.S.-sourced goods not subject to the tariffs. Defendant now receives an inequitable windfall by recovering from the federal

government tariff costs that Defendant passed on to consumers, like Plaintiffs, who purchased goods from Defendant, and therefore, are the real parties in interest to the IEEPA tariff refunds.

2. Defendant collected hundreds of millions of dollars in unlawful tariffs from consumers by raising prices on imported goods and U.S.-sourced goods while the Trump Administration IEEPA tariffs were in effect.

3. The tariff refund process, set in place by the federal government after the United States Supreme Court struck down the IEEPA tariffs, allows only the importer of record ("IOR") to apply for and receive a refund for any moneys paid for the import of goods. However, Defendant, as IOR, shifted the cost of these tariffs to its customers by way of price increases to products subject to tariffs and items not subjected to tariffs. Thus, it is Plaintiffs and similarly situated consumers who bore the tariff costs in the first place.

4. Defendant has not returned any portion of those costs it passed on to consumers, and it has no intention of doing so. It has, in short, generated and retained a windfall from unlawful government action, and consumers—not Defendant—are the ones left paying for it.

5. This dispute arises from a fundamental inequity in the tariff refund process. Only the IOR may seek a refund for an unlawfully assessed tariff—but IORs merely advance the tariff cost at the border and recoup all or a substantial part of it through higher consumer prices. In economic reality, the consumer paid the illegal tariff.

6. This inequity is compounded when, as here, a tariff is struck down by the courts. Consumers, who bore the true economic burden, have no direct avenue for redress—they both lack a statutory cause of action in the Court of International Trade ("CIT") and standing to seek a refund. That right belongs exclusively to Defendant as the IOR, regardless of who actually paid. As designed, the refund process establishes that large corporations that passed the entire tariff cost

onto their customers remain exclusively entitled to recover a full refund of tariffs the Supreme Court has since declared unlawful.

7. This lawsuit seeks to force Defendant to return funds collected from millions of consumers to cover IEEPA tariffs between February 2025 and February 2026. Defendant has made no commitment to compensate consumers for those payments. This act fails to reimburse consumers for the portion of the unlawful tariff that was forced upon them by Defendant's across-the-board price increases, and also unfairly enriches Defendant at the expense of consumers.

8. Plaintiffs seek a judgment that requires Defendant to return to Plaintiffs, and others similarly situated, all IEEPA duties passed on to customers in the form of higher prices on products, with interest.

9. Plaintiffs also seek restitution of the tariff and tariff-related overcharges they, and others similarly situated, paid, or a proportionate share of any tariff refund Defendant recovers, together with interest, reasonable attorneys' fees, and costs.

## II. JURISDICTION

10. This Court has jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. §1332(d), because the proposed Class consists of 100 or more members; the amount in controversy exceeds $5,000,000, exclusive of costs and interest; and minimal diversity exists. This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. §1367.

11. Venue is proper in this District under 28 U.S.C. §1391 because a substantial part of the events, omissions, and misrepresentations giving rise to Plaintiffs' claims occurred in this District. Defendant also marketed, advertised, made available for sale, and shipped products subject to IEEPA tariffs within this District.

## III. PARTIES

**A. Plaintiff**

12. Plaintiff Joseph Mirabelli is domiciled in Buffalo, New York, and therefore is a citizen of the State of New York. During the Class Period, Plaintiff purchased goods directly from Defendant in the State of New York. Some or all these products were imported from countries subject to IEEPA tariffs and sold at prices inflated by Defendant's pass-through of IEEPA tariff costs. Plaintiff also purchased other products and services that were sourced from within the United States and, while not subject to tariffs, were sold at inflated prices, due to Defendant spreading the IEEPA tariff costs across its product line, so that purchasers of non-tariffed domestic goods also bore the tariff burden.

13. Plaintiff Luis Gonzalez, III is domiciled in Buffalo, New York, and therefore is a citizen of the State of New York. During the Class Period, Plaintiff purchased goods directly from Defendant in the State of New York. Some or all these products were imported from countries subject to IEEPA tariffs and sold at prices inflated by Defendant's pass-through of IEEPA tariff costs. Plaintiff also purchased other products and services that were sourced from within the United States and, while not subject to tariffs, were sold at inflated prices, due to Defendant spreading the IEEPA tariff costs across its product line, so that purchasers of non-tariffed domestic goods also bore the tariff burden.

**B. Defendant**

Defendant Apple Inc. ("Apple" or "Defendant") is a California corporation with its headquarters, principal executive offices, and principal place of business at One Apple Park Way, Cupertino, California 95014. Apple is registered with the New York Department of State as a foreign business corporation under the fictitious name "Apple Computer" (DOS ID 1008959), lists One Apple Park Way, Cupertino, California 95014 as its principal executive office address, and

maintains as its registered agent C T Corporation System, 28 Liberty Street, New York, New York 10005. At all relevant times, Defendant sold imported products, including the iPhone, Mac, iPad, Apple Watch, AirPods, and related accessories, directly to consumers through its retail stores and website, and through third-party cellular carriers and other resellers. Between February 4, 2025, and February 20, 2026, Defendant collected tariff costs from those consumers on products subject to tariffs imposed under the International Emergency Economic Powers Act ("IEEPA"), as well as on products not subject to tariffs imposed under IEEPA. On information and belief, the misconduct alleged herein originated from and was directed out of Defendant's headquarters and principal place of business in Cupertino, California. Defendant has retail locations and sells products in the State of New York.

## IV. FACTUAL ALLEGATIONS

### A. Apple is an Enormous Retailer of Imported Goods and U.S.-Sourced Goods

14. Defendant is a major seller of consumer electronics that imports a substantial volume of products into the United States and sells them to consumers throughout the country.

15. Defendant designs the products it sells and contracts with third-party manufacturers, a substantial majority of which are located outside the United States, to produce them. Defendant then imports those products into the United States and sells them to consumers through its retail and online stores and through third-party resellers. Defendant owns the products it imports, and it sets the retail prices its customers pay for those products.

16. For the imported goods it sells, Defendant's involvement begins before the goods enter the United States. As the IOR, Defendant signs the customs declaration, takes legal responsibility for compliance, and pays the tariff to U.S. Customs and Border Protection ("CBP"). On information and belief, Defendant serves as the IOR for a substantial portion of the imported goods it sells.

17. Defendant's products are not limited to goods subject to IEEPA tariffs. Defendant also sources stocks, and sells a substantial volume of products that were not subject to IEEPA tariffs. Defendant offers these products to consumers alongside its tariffed products. As with its tariffed products, Defendant owns this inventory and sets the retail prices its customers pay

18. The IEEPA tariffs increased the costs Defendant incurred on the imported goods for which it was the IOR. On information and belief, rather than absorbing those increased costs or confining them to the imported goods that generated them, Defendant recovered the tariff costs by raising prices across its products, including on U.S.-sourced goods that were never subject to IEEPA tariffs.

19. As a result, Defendant sold its imported goods at prices inflated by its direct pass-through of IEEPA tariff costs and sold its U.S.-sourced goods at prices likewise inflated by Defendant's decision to spread those same tariff costs across its sold products.

20. Consumers who purchased U.S.-sourced goods from Defendant therefore bore a portion of the IEEPA tariffs that Defendant incurred on imported goods those consumers never purchased.

**B. The Trump Administration Invokes the IEEPA to Implement Tariffs**

21. On February 4, 2025, Trump issued an executive order imposing a 10% tariff on Chinese imports.[1] In March 2025, Trump issued two more executive orders imposing a 25% on goods imported from Canada and Mexico, respectively.[2] By April 2025, the Trump Administration had imposed tariffs on imports from most other U.S. trading partners.

---

[1] Andrea Shalal et al., *Trump launches trade war with tariffs on Mexico, Canada and China*, Reuters. February 1st, 2025. Retrieved from: https://www.reuters.com/business/trump-readies-order-steep-tariffs-goods-mexico-canada-china-2025-02-01/.
[2] *Id.*

22. The Trump Administration invoked the IEEPA as the legal basis for these tariffs. The IEEPA was originally designed to allow the President to regulate international commerce during declared national emergencies.[3] The Trump Administration pointed to drug trafficking across U.S. borders and the persistent American trade deficit as the legal emergencies justifying the IEEPA tariffs.[4]

23. The IEEPA tariffs did not operate in isolation. For example, for much of 2025, the effective rate on most Chinese electronics was approximately 45%: a 20% IEEPA layer on top of an already existing 25% Section 301 tariff.[5] At the peak of the escalation in April-May 2025, average U.S. tariffs on Chinese imports reached 127.2% in early May 2025. At the peak of the escalation in April-May 2025, average U.S. tariffs on Chinese imports reached 127.2% in early May 2025.[6]

24. On April 3, 2025, within days of the IEEPA tariffs going into effect, the first lawsuit challenging their legality was filed.[7] Despite palpable fear from business groups of incurring the Trump Administration's anger,[8] other lawsuits would eventually follow.[9] These filings were widely reported and as a major retailer, Defendant certainly tracked their progress.[10]

---

[3] Christopher A. Casey et al., *The International Emergency Economic Powers Act: Origins, Evolution, and Use*, Cong. Rsch. Serv. R45618 (Sep. 1, 2025) https://www.congress.gov/crs-product/R45618.
[4] Shalal, *supra* note 1.
[5] Section 301 of the US Trade Act of 1974 authorizes the President to take all appropriate action, including tariffs, to remove a foreign government's practice that violates an international trade agreement and that restricts US commerce. 19 U.S.C. § 2411. Trump implemented Section 301 tariffs in 2018.
[6] Chad P. Bown, *US-China Trade War Tariffs: An Up-to-Date Chart, Peterson Institute for International Economics* (Nov. 14, 2025) (https://www.piie.com/research/piie-charts/2019/us-china-trade-war-tariffs-date-chart)
[7] *Emily Ley, Paper, Inc., d/b/a Simplified v. Trump*, No. 3:25-cv-464-TKW-ZCB (N.D. Fla.), April 3rd, 2025.
[8] Caitlin Oprysko¸ *'Everyone is terrified': Business and government officials are afraid to cross Trump on tariffs*, Politico (Apr. 4, 2025) (https://www.politico.com/news/2025/04/04/trump-tariffs-fear-lobby-business-congress-00006608)
[9] See. e.g. Doug Palmer¸ *Trump's tariffs could face more than one legal challenge*, Politico. April 3rd, 2025. Retrieved from: https://www.politico.com/news/2025/04/04/first-lawsuit-filed-against-trumps-tariffs-00273646; Larry Neumeister, *A dozen states sue the Trump administration to stop tariff policy*, Associated Press. April 23rd, 2025. Retrieved from: https://apnews.com/article/tariffs-lawsuit-what-states-sue-0d6531b7f60aaa2f7c6c35e0a944d4a9.
[10] *Id.*

25. On February 20, 2026, the U.S. Supreme Court issued its opinion in *Learning Resources, Inc. v. Trump*, holding that the IEEPA did not authorize the President to impose the IEEPA tariffs and that they were invalid ab initio.[11]

26. The Supreme Court's decision in *Learning Resources* eliminated the legal basis for the IEEPA tariffs and created a pathway for IORs like Defendant to seek refunds of the tariffs previously collected by the federal government.

**C. Consumers Incurred Price Increases on Defendant's Products While the IEEPA Tariffs Were in Effect**

27. The IEEPA tariffs increased the costs that retailers, suppliers, and distributors, including Defendant, incurred on imported goods. Across many industries, companies responded by passing those increased costs on to consumers through higher prices. A survey of American chief executive officers ("CEO") found that a majority had already raised prices or were considering doing so in response to the tariffs,[12] and major retailers publicly announced tariff-driven price increases throughout 2025 and into 2026.[13]

28. Independent economic analysis confirms that a substantial portion of the tariff costs was passed through to U.S. consumers during the relevant period. The Federal Reserve found that pass-through to consumers for goods imported from China was at least 30% between April and

[11] *Learning Resources, Inc. v. Trump*, 607 U.S. ___, 146 S. Ct. 628 (2026) (slip op. at 20).
[12] *Here Are the Retailers Raising Prices as Trump Tariffs Take Hold*, CNBC. May 31st, 2025. (https://www.cnbc.com/2025/05/31/trump-tariffs-here-are-the-retailers-raising-prices.html) (reporting the Chief Executive Group/AlixPartners survey of U.S. CEOs and individual retailer price-increase announcements).
[13] Megan Cerullo, *Walmart and Other Big Companies Say Tariffs Are Forcing Them to Hike Prices*, CBS News. February 20th, 2026. Retrieved from: https://www.cbsnews.com/news/walmart-trump-tariffs-general-merchandise-inflation/.

December 2025.[14] Federal Reserve Bank of New York research found that U.S. businesses and consumers together bore nearly 90% of the cost of the 2025 tariffs.[15]

29. These price increases were not confined to imported goods. Analyses of retail pricing found that prices rose on both imported and domestically produced goods as retailers spread tariff-related costs across their product lines.[16] Researchers estimated that tariff pass-through added roughly 0.7 percentage points to the Consumer Price Index by September 2025, and that the lowest-priced product varieties saw the steepest increases (around 5%) because retailers had the least room to absorb the cost in their margins.[17]

30. The cumulative burden on consumers was enormous. After years of moderating prices, consumer goods prices rose throughout 2025 and into 2026.[18] According to the Budget Lab at Yale University, tariffs accounted for an estimated 86% of the rise in prices for imported household goods, with the effect most pronounced for long-lasting durable goods such as cars, appliances, and furniture.[19] American consumers paid more than $231 billion in tariff costs between February 2025 and January 2026, an average of roughly $1,745 per family.[20]

31. Defendant's products are not limited to imported goods. Defendant also sources, stocks, and sells a substantial volume of consumer goods and services that originate within the

---

[14] *The Slow Climb: How Tariffs Gradually Raised Retail Prices in 2025*, Bd. of Governors of the Fed. Reserve Sys., FEDS Notes (Mar. 5, 2026) (https://www.federalreserve.gov/econres/notes/feds-notes/the-slow-climb-how-tariffs-gradually-raised-retail-prices-in-2025-20260305.html)

[15] Cerullo, *Walmart and Other Big Companies*, supra (reporting Federal Reserve Bank of New York research that U.S. businesses and consumers together bore nearly 90% of the cost of the 2025 tariffs).

[16] *Are Tariffs Raising U.S. Retail Prices?* (updated), Econofact (Dec. 5, 2025) (https://econofact.org/are-tariffs-raising-u-s-retail-prices) (summarizing the Cavallo/Harvard Business School Pricing Lab analysis of online pricing at five major U.S. retailers, including price increases on domestically produced goods).

[17] *Id.*

[18] Yale Budget Lab, *Tracking the Economic Effects of Tariffs* (https://budgetlab.yale.edu/research/tracking-economic-effects-tariffs)

[19] *Id.*

[20] *American Families Have Paid More Than $1,700 Each in Tariff Costs Since Trump Entered Office*, Joint Economic Committee Minority. February, 2026. Retrieved from: https://www.jec.senate.gov/public/_cache/files/7cc03e65-d40a-465f-9e88-09dd53d3502f/jec-fact-sheet-on-cost-of-tariffs-for-families-update.pdf

United States and are not subject to IEEPA tariffs, which it offers to consumers alongside its imported goods. As with its imported goods, Defendant owns this inventory and sets the retail prices its customers pay.

32. The IEEPA tariffs increased the costs Defendant incurred on the imported goods for which it served as an IOR. On information and belief, rather than absorbing those increased costs or confining them to the imported goods that generated them, Defendant made a business decision to recover the tariff costs by raising prices across its products, changing its product mix to push customers into purchasing more expensive products and devices – increasing the average retail price per device it received throughout its product mix – , and also raising prices on U.S.-sourced goods and services that were never subject to IEEPA tariffs.

33. Apple designs, markets, and sells smartphones, personal computers, tablets, wearables, and accessories, including the iPhone, Mac, iPad, Apple Watch, and AirPods. It also sells services like Apple TV and offers a service plan for pay, among other products and services. For its fiscal year 2025, which ended September 27, 2025, Apple reported total net sales of approximately $416.2 billion, of which approximately $151.8 billion were attributable to sales in the United States.[21]

34. A significant portion of the products Apple sells in the United States are manufactured abroad and imported. Apple discloses that "[a] significant majority of the Company's manufacturing is performed in whole or in part by outsourcing partners located primarily in China mainland, India, Japan, South Korea, Taiwan and Vietnam."[22] When the IEEPA tariffs were expanded in April 2025, Bloomberg reported that Apple "still produces the majority

[21] *Apple Inc., Annual Report (Form 10-K) for the Fiscal Year Ended September 27, 2025*, at 48. October 31st, 2025.
[22] *Id.* at 6.

of its US-sold devices in Chinese factories."[23] Upon information and belief, Apple, or an entity acting on its behalf, served as the IOR for the products Apple sold to Plaintiffs and the Class.

35. Apple's own statements confirm that the IEEPA tariffs accounted for the bulk of the tariff costs Apple incurred during the Class Period. On May 1, 2025, Apple's then-Chief Executive Officer, Tim Cook ("Cook"), told investors that "most of our tariff exposure relates to the February IEEPA related tariff at the rate of 20%, which applies to imports to the U.S. for products that have China, as their country of origin," and that additional tariffs on "some of our U.S. Apple Care and accessories businesses" brought "the total rate in China for these products to at least 145%."[24] On July 31, 2025, Cook told investors that "the bulk of the tariffs that we paid were the IEEPA tariffs that hit early in the year related to China."[25]

36. Those costs were substantial. On July 31, 2025, Cook reported that "[f]or the June quarter, we incurred approximately $800 million of tariff-related costs," and projected an additional $1.1 billion for the September quarter.[26] On October 30, 2025, Apple's Chief Financial Officer, Kevan Parekh ("Parekh"), reported that Apple's September quarter results included "approximately $1.1 billion of tariff-related costs," and projected an additional $1.4 billion for the December quarter.[27] On January 29, 2026, Parekh confirmed that Apple had "landed roughly in that range."[28] Apple continued to incur tariff-related costs in its March 2026 quarter.[29] Press reports

---

[23] Mark Gurman, *Apple Production Hubs Hit by Tariffs, Sending Stock Plunging*, Bloomberg. April 2nd, 2025, updated April 3rd, 2025. Retrieved from: https://www.bloomberg.com/news/articles/2025-04-02/apple-shares-slide-after-tariffs-threaten-to-hit-production-hubs
[24] *Apple Inc., Q2 FY2025 Earnings Call Transcript*. May 1, 2025. Published by The Motley Fool.
[25] *Apple Inc., Q3 FY2025 Earnings Call Transcript*. July 31, 2025. Published by The Motley Fool.
[26] *Id.*
[27] *Apple Inc., Q4 FY2025 Earnings Call Transcript*. October 30, 2025. Published by The Motley Fool.
[28] *Apple Inc., Q1 FY2026 Earnings Call Transcript*. January 29, 2026. Published by The Motley Fool.
[29] *Apple Inc., Q2 FY2026 Earnings Call Transcript*. April 30, 2026. Published by The Motley Fool.

have estimated that Apple paid between $3.2 billion and $3.3 billion in tariffs while the IEEPA tariffs were in effect.[30]

37. Apple recorded these tariff costs in its products cost of sales. In its fiscal year 2025 annual report, Apple stated that its "[p]roducts gross margin percentage decreased during 2025 compared to 2024 primarily due to a different mix of products and tariff costs."[31] In the same report, Apple acknowledged that tariffs and other restrictive trade measures can require it to "increase the prices of its products and services," and can affect its "pricing and gross margin."[32]

38. From the outset, market observers connected the IEEPA tariffs to the prices U.S. consumers would pay for Apple's products. Industry analysts estimated that Apple would need to raise its U.S. prices by 17% to 30% or more to fully offset its tariff costs.[33]

39. On April 3, 2025, Ming-Chi Kuo, an analyst at TF International Securities who closely tracks Apple's supply chain, wrote that "[i]f Apple keeps prices unchanged, its overall gross margin could significantly drop by an estimated 8.5-9%." Kuo observed that "high-end consumers are relatively more accepting of price increases" and that Apple "could also use many strategies like increasing carrier subsidies or cutting Trade-In program discounts to offset tariff costs while softening the perception of price hikes."[34]

---

[30] Hugh Cameron, *Apple Reaps Billion-Dollar Tariff Refund—Will Consumers See Any Benefit?*, Newsweek. July 31st, 2026. Retrieved from: https://www.newsweek.com/apple-reaps-billion-dollar-tariff-refund-will-consumers-see-any-benefit-12271423; *Tariff Refunds Have Started, but Apple Won't See Cash Back for Months*, AppleInsider. April 20th, 2026. Retrieved from: https://appleinsider.com/articles/26/04/20/tariff-refunds-have-started-but-apple-wont-see-cash-back-for-months.

[31] *Apple Inc., Annual Report (Form 10-K) for the Fiscal Year Ended September 27, 2025*. October 31st, 2025, at 24.

[32] *Id.* at 6, 22.

[33] Juli Clover, *Will the iPhone 17 Cost More? All the Rumors About a Price Increase*, MacRumors. August 12th, 2025. Retrieved from: https://www.macrumors.com/2025/08/12/iphone-17-price-rumors) (collecting estimates; Clare Duffy, *How Apple Could Quietly Raise iPhone Prices This Fall Without Blaming Tariffs*, CNN. May 14th, 2025. Retrieved from: https://www.cnn.com/2025/05/14/tech/apple-iphone-prices-tariffs.

[34] Ming-Chi Kuo (@mingchikuo), X (Formerly "Twitter"). Apr. 3rd, 2025. Retrieved from: https://x.com/mingchikuo/status/1907775228069163351; *see also* Andrew Orr, *Apple's Fight With Trump's Tariffs Will Shift the Cost to Customers*, AppleInsider. April 3rd, 2025. Retrieved from: https://appleinsider.com/articles/25/04/03/apples-fight-with-trumps-tariffs-will-shift-the-cost-to-customers.

40. On April 6, 2025, Bloomberg's chief Apple correspondent, Mark Gurman, wrote that "with tariffs hitting Apple's major sources of production, the specter of a price increase is back in a big way." He framed Apple's decision as whether to "eat the costs of the tariffs, push suppliers to reduce prices, pass on the expense to customers or make further supply chain adjustments," concluding, "[m]y bet is that Apple will do a combination of all four." He predicted that Apple would "seriously consider iPhone price adjustments," adding that "[i]t helps that consumers have probably heard about the outside factors here and won't see it as a cash grab," and that, because inventory already in the United States was not subject to the levies, Apple "could hold off until the next iPhones in September to make adjustments." Gurman also recounted how Apple had previously raised prices without changing a model's advertised price: in 2023, "Apple enacted a quasi price increase with the iPhone 15: It boosted the starting price of the Pro Max version by $100 by eliminating the lowest capacity option."[35] On May 5, 2025, Gurman wrote that Apple is "not likely to eat the full cost, and that suggests that Apple will ultimately need to hike prices."[36]

41. Consumers expected tariff-driven price increases and acted on that expectation. In April 2025, CBS News reported that "Apple product prices are expected to rise sharply."[37] Cook later acknowledged that approximately "1 point of the 10 points" of Apple's revenue growth in the June 2025 quarter was attributable to "people buying because of discussions about tariffs."[38] Bloomberg reported that consumers were "rushing to stores to get out ahead of expected price

[35] Gurman, *Apple iPhone Price Hikes Are Now Looking Possible in the US*, supra.
[36] Mark Gurman, *Apple Reaches Critical Juncture With Tariffs, AI and Services Turmoil*, Bloomberg. May 5th, 2025. Retrieved from: https://www.bloomberg.com/news/newsletters/2025-05-05/apple-s-make-or-break-moment-with-tariffs-ai-google-deal-epic-games-lawsuit-mab141ke
[37] Megan Cerullo, *Apple Airlifts More Than 1 Million iPhones Out of India to Avoid Trump Tariffs, Reuters Reports*, CBS News. April 10th, 2025. Retrieved from: https://www.cbsnews.com/news/apple-airlifts-iphones-india-tariffs/
[38] *Apple Inc., Q3 FY2025 Earnings Call Transcript*. July 31st, 2025. Published by The Motley Fool.

increases,”[39] and The Wall Street Journal reported Apple’s results under the headline “Fear of Higher Prices Powers iPhone Sales, Lifting Apple Results.”[40]

42. Apple declined to rule out passing its tariff costs on to consumers. On May 1, 2025, an analyst asked Cook about Apple’s “philosophy on pricing elevated costs to the extent that comes through, whether that be to resellers or end consumers.” Cook answered, “[o]n the pricing piece, we have nothing — nothing to announce today.”[41]

THE WALL STREET JOURNAL.

EXCLUSIVE TECHNOLOGY

**Apple Considers Raising iPhone Prices, Without Blaming Tariffs**

China still leads production of high-end models, exposing the company to trade risk

By Rolfe Winkler and Yang Jie
May 12, 2025 6:04 am ET

43. On May 12, 2025, The Wall Street Journal reported that – according to their sources familiar with the matter – Apple was “weighing price increases for its fall iPhone lineup, a step it is seeking to couple with new features and design changes,” and that Apple was “determined to avoid any scenario in which it appears to attribute price increases to U.S. tariffs on goods from China.” According to the Journal, supply-chain insiders described Apple’s “least-bad choice” as

[39] Mark Gurman, *Apple Sales Accelerate on Strength of iPhone, China Demand*, Bloomberg. July 31st, 2025. Retrieved from: https://www.bloomberg.com/news/articles/2025-07-31/apple-revenue-tops-estimates-on-strength-of-iphone-china-market
[40] Rolfe Winkler, *Apple’s iPhone Sales Blow Past Estimates as Customers Raced to Beat Tariffs*, The Wall Street Journal. July 31st, 2025. Retrieved from: https://www.wsj.com/business/earnings/apple-earnings-q3-2025-aapl-stock-6ddd867b
[41] *Apple Inc., Q2 FY2025 Earnings Call Transcript*. May 1, 2025. Published by Seeking Alpha.

"raising prices on the new iPhones to preserve profit and finding reasons other than tariffs to explain the move."[42] The report was widely republished.[43]

CNN Business

BUSINESS > TECH • 5 MIN READ

**How Apple could quietly raise iPhone prices this fall without blaming tariffs**

MAY 14, 2025

By Clare Duffy

44. Two days later, CNN reported that since "hiking prices because of tariffs risks drawing Trump's ire – something another tech company has already learned the hard way…[A]pple may try to link those higher prices to new AI features or fresh hardware, or charge extra for additions like increased storage instead of raising the amount consumers will see on the price tag." Gil Luria of D.A. Davidson told CNN: "When we say price increases, we don't mean like-for-like pricing increases necessarily." Daniel Morgan of Synovus explained that if Apple were to "come out and do an across-the-board increase, then the headline news is 'tariffs cost passed onto customers.'" And Mike Bailey of FBB Capital Partners observed that consumers "would likely feel better about paying more for a thinner phone, or design and format changes, rather than feeling like a sucker trapped in the middle of a trade war."[44]

---

[42] Rolfe Winkler & Yang Jie, *Apple Considers Raising iPhone Prices, Without Blaming Tariffs*, Wall Street Journal. May 12th, 2025. Retrieved from: https://www.wsj.com/tech/apple-iphone-price-increase-2eaebb14.

[43] *See, e.g.*, *Apple Weighs Raising iPhone Prices in New Lineup, WSJ Says*, Bloomberg. May 12th, 2025. Retrieved from: https://www.bloomberg.com/news/articles/2025-05-12/apple-weighs-raising-iphone-prices-in-new-lineup-wsj-says; Ben Lovejoy, *Apple Might Increase iPhone 17 Prices, but Not Reveal the True Reason* – WSJ, 9to5Mac. May 12th, 2025, https://9to5mac.com/2025/05/12/apple-might-increase-iphone-17-prices-but-not-reveal-the-true-reason-wsj); Chris Hauk, *Apple Considering Price Increases for iPhone 17 Lineup, But Won't Blame Tariffs*, MacTrast. May 12th, 2025. Retrieved from: https://www.mactrast.com/?p=169563); John Gruber, WSJ*: 'Apple Considers Raising iPhone Prices, Without Blaming Tariffs'*, Daring Fireball. May 19th, 2025. Retrieved from: https://daringfireball.net/linked/2025/05/19/wsj-apple-iphone-pricing-tariffs

[44] Duffy, *How Apple Could Quietly Raise iPhone Prices This Fall Without Blaming Tariffs*, supra.

45. Analysts expressly attributed the anticipated iPhone price increases to the tariffs. On July 30, 2025, Jefferies reported that “we expect a $50 selling price hike for iPhone 17 Slim/P/PM to offset higher component costs and China tariff.”[45] Jefferies calculated that “China’s 20% fentanyl tariff,” assuming 40% of the new models sold in the United States would be made in China, would add approximately 8% to Apple’s costs.[46] As AppleInsider summarized, Jefferies “says that the price rise is specifically to offset the impact of the tariffs.”[47]

46. Other analysts reached the same conclusion. Jeff Pu of GF Securities expected U.S. iPhone 17 prices to rise and “sees the price increases as a result of the tariffs,” noting that “20 percent is on the cards for goods from China.”[48] MacRumors calculated that Apple’s reported tariff costs equated to “around $20 per iPhone,” observed that Apple “does have to pay . . . the 20 percent ‘Fentanyl Tariff’ on goods imported from China,” and noted that “[i]ncreasing costs of one model by $50 (as rumored for the iPhone 17 Pro) could also help offset the cost.”[49]

CNBC

> After months of eating the tariff costs itself, Apple may finally pass those costs to consumers with this month’s launch of the iPhone 17 models.

[45] Ghazal Ahmed, *Apple (AAPL) Reiterated as Hold by Jefferies Amid iPhone 17 Price Hike Expectations*, Insider Monkey, Yahoo Finance. August 5th, 2025 Retrieved from: https://finance.yahoo.com/news/apple-aapl-reiterated-hold-jefferies-095553069.html; *see also Apple’s iPhone 17 Price Hike Likely Says Jefferies; Expects Strong Q3 Results*, Seeking Alpha. July 30th, 2025. Retrieved from: https://seekingalpha.com/news/4474279-apples-iphone-17-price-hike-likely-says-jefferies-expects-strong-q4-results).

[46] Hannah Parker, *Apple’s Next iPhone Will Probably Come With a Price Hike, Analyst Says*, Quartz. July 31st, 2025. Retrieved from: https://qz.com/apples-iphone-17-price-hike-analyst-says.

[47] William Gallagher, *Only the Base iPhone 17 May Escape a $50 Price Hike*, AppleInsider. July 30th, 2025. Retrieved from: https://appleinsider.com/articles/25/07/30/only-the-base-iphone-17-may-escape-a-50-price-hike.

[48] Ben Schwan, *Another Report About iPhone 17 Price Increase*, heise online Mac & i. August 11th, 2025. Retrieved from: https://heise.de/-10516334

[49] Clover, *Will the iPhone 17 Cost More? All the Rumors About a Price Increase*, supra.

47. On September 3, 2025, six days before Apple's launch event, CNBC reported that "[a]fter months of eating the tariff costs itself, Apple may finally pass those costs to consumers with this month's launch of the iPhone 17 models," and cautioned that "[i]f Apple does increase prices on its phones this year, don't expect management to blame tariffs." An IDC analyst told CNBC that "[n]o one's going to come out and say it's related to tariffs."[50]

CNBC

> "No one's going to come out and say it's related to tariffs," said IDC analyst Nabila Popal.

48. CNBC explained that "[o]ne way that Apple could subtly raise prices is by eliminating the entry-level version of its phones, forcing users to upgrade to get more storage at a higher starting price," and reported that JPMorgan expected Apple to do precisely that with the iPhone 17 Pro, "meaning that users will have to pay $1,099 for an iPhone 17 Pro."[51]

49. That is what Apple did. On September 9, 2025, Apple raised the starting price of its iPhone Pro from $999 to $1,099—"the first time that Apple's entry-level Pro phone has gotten a price increase over $999 since the debut of its predecessor iPhone X in 2017"—and replaced the $899 iPhone 16 Plus with the $999 iPhone Air.[52] CNBC reported that "investors and analysts widely believed Apple would raise iPhone prices as the company expects to spend more than $1 billion this quarter on tariff costs," that Apple "tried to soften the price increase blow" by pointing to added storage, and that "Apple did not mention tariffs."[53] Bloomberg likewise reported that

---

[50] Kif Leswing, *Apple Has Survived Trump's Tariffs So Far. It Might Raise iPhone Prices Anyway*, CNBC. September 3rd, 2025. Retrieved from: https://www.cnbc.com/2025/09/03/apple-might-raise-iphone-prices-despite-its-handling-of-tariffs-so-far.html

[51] *Id.*

[52] Kif Leswing, *Apple Raises iPhone Pro Starting Price in U.S. for First Time Since 2017*, CNBC. September 9th, 2025. Retrieved from: https://www.cnbc.com/2025/09/09/apple-iphone-price-pro-max-us.html.

[53] *Id.*

"[t]he Pro models did climb from $999 to $1,099," that the iPhone Air "rose by $100 as well," and that analysts had predicted price increases "especially with President Donald Trump's tariffs on Chinese imports looming."[54]

50. With the September 2025 launch of the iPhone 17 Pro, Apple eliminated the lowest-storage configuration. The iPhone 16 Pro had been offered with 128GB of storage at $999; the iPhone 17 Pro was offered only from 256GB, at $1,099.

51. The 256GB, 512GB, and 1TB iPhone 17 Pro configurations carried the same prices as their iPhone 16 Pro counterparts with no price increases at that moment. Instead, Apple removed the configuration that price-conscious Pro buyers purchased. A consumer who would have bought the $999 base model could no longer do so and had to pay at least $100 more for additional storage the consumer had not chosen. This was the same price increase method analysts predicted Apple would use to recover its tariff costs without attributing the increase to tariffs.

52. The eliminated configuration was not a niche option. Most U.S. iPhone buyers purchase base storage: Consumer Intelligence Research Partners ("CIRP") reported that only 46% of iPhone buyers upgraded from base storage in the December 2025 quarter, and that in the March 2026 quarter a majority of buyers of iPhone 17 models did not upgrade from base storage.[55]

> Notably, there was a $100 price increase for the iPhone 17 Pro, along with the doubling of base storage from 128 GB to 256 GB. So, in effect, Apple built in the storage upgrade and every "Pro" buyer had to go along.

Consumer Intelligence Research Partners[56]

---

[54] Mark Gurman, *Apple Starts Getting Shoppers Used to the Idea of $2,000 iPhones*, Bloomberg. September 10th, 2025. Retrieved from: https://www.bloomberg.com/news/articles/2025-09-10/apple-starts-getting-customers-used-to-the-idea-of-2-000-iphones.

[55] Michael Levin and Josh Lowitz, *Apple iPhone Storage Upgrades Stable, so It Relies on Pricing and Model Lineup*. Consumer Intelligence Research Partners. Retrieved from: https://cirpapple.substack.com/p/apple-iphone-storage-upgrades-stable

[56] *Id.*

53. CIRP described the effect of the iPhone 17 Pro change directly: by pairing a $100 price increase with a doubling of base storage from 128GB to 256GB, "Apple built in the storage upgrade and every 'Pro' buyer had to go along."[57]

54. The $100 increase was not justified by the cost of the additional storage. Apple charges consumers far more for added storage than the storage costs Apple to supply. As CIRP explained before the iPhone 17 launch, Apple's storage upgrades add significant profit to each sale, because the prices Apple charges for added storage "far exceed the cost of a bigger storage chip."[58]

55. CIRP later reported that Apple continued to earn considerable margin on storage even after memory chip costs began to rise.[59] Research firm TechInsights estimated that the entire 256GB of flash storage in the iPhone 17 Pro cost Apple about $13.[60] Upon information and belief, the incremental cost to Apple of supplying 256GB of storage, rather than 128GB, was therefore a small fraction of the $100 by which Apple raised the model's entry price.

56. The change raised what U.S. consumers paid per iPhone. CIRP reported that the weighted average retail price of new iPhones sold in the United States reached $1,077 in the December 2025 quarter, the highest December quarter since CIRP began its survey and a 13%

---

[57] Michael Levin & Josh Lowitz, *Apple's iPhone Line-up Strategy is Driving Up Average Selling Price*, Consumer Intelligence Research Partners. May 13th, 2026. Retrieved from: https://cirpapple.substack.com/p/apples-iphone-line-up-strategy-is.

[58] Michael Levin & Josh Lowitz, *Are iPhone Buyers Finally Ready to Rely on the Cloud?*, Consumer Intelligence Research Partners. January 29th, 2025. Retrieved from: https://cirpapple.substack.com/p/are-iphone-buyers-finally-ready-to; see also Michael Levin & Josh Lowitz, *iPhone Buyers Pay Up for More Storage, Consumer Intelligence Research Partners*. February 1st, 2023. Retrieved from: https://cirpapple.substack.com/p/iphone-buyers-pay-up-for-more-storage.

[59] Michael Levin & Josh Lowitz, *Apple iPhone Storage Upgrades Stable, so It Relies on Pricing and Model Lineup*, Consumer Intelligence Research Partners. February 11th, 2026. Retrieved from: https://cirpapple.substack.com/p/apple-iphone-storage-upgrades-stable.

[60] Hartley Charlton, *iPhone 18 Pro Could Start at $1,399 Amid Price Hikes*, MacRumors. June 19th, 2026. Retrieved from: https://www.macrumors.com/2026/06/19/iphone-18-pro-could-start-at-1399/ (reporting TechInsights estimates published in The Wall Street Journal

increase from $953 a year earlier, driven by a shift toward premium models and by the $100 price increase on the iPhone 17 Pro.[61]

57. The new pricing raised what U.S. consumers paid for iPhones. At launch, analysts expected Apple's new iPhones to "modestly raise the product's average selling price."[62]




**iPhone US-Weighted Average Retail Price**[63]

58. Consumer Intelligence Research Partners later reported that price increases helped raise the weighted average retail price of new iPhones sold in the United States in the December 2025 quarter.[64]

59. Apple sets a single U.S. price for each product configuration, regardless of the country in which a particular unit was manufactured or the tariff paid upon its importation. Upon

---

[61] Michael Levin & Josh Lowitz, *iPhone 17 Average Selling Price Contributes to Record Quarter*, Consumer Intelligence Research Partners. February 4th, 2026. Retrieved from: https://cirpapple.substack.com/p/iphone-17-average-selling-price-contributes
[62] Lisa Eadicicco, *$2,000 for a Phone? Apple Says Yes*, CNN. September 19th, 2025. Retrieved from: https://www.cnn.com/2025/09/19/tech/apple-iphone-17-pro-max-2tb-2000-dollars. (quoting CFRA analyst Angelo Zino).
[63] Michael Levin and John Lowitz, *iPhone 17 Average Selling Price Contributes to Record Quarter*. Consumer Intelligence Research Partners. Retrieved from: https://cirpapple.substack.com/p/iphone-17-average-selling-price-contributes
[64] *Id.*

information and belief, Apple recovered the IEEPA tariff costs it incurred on its imported products through the prices it charged consumers in the United States across its product line, including through increases to starting prices, the elimination of lower-priced configurations, and changes to the value offered at existing price points.

60. Apple's price increases were not limited to iPhone hardware. In the first week of February 2025, as the first IEEPA tariffs on Chinese imports took effect, Apple raised the monthly price of AppleCare+ by $0.50 for every iPhone model in the United States, for both the standard plan and the plan with theft and loss coverage. Standard AppleCare+ for the iPhone 16, for example, rose from $9.99 to $10.49 per month.[65] At the same time, Apple stopped offering most prepaid two-year AppleCare+ plans, whose price it left unchanged, moving customers to the monthly subscriptions whose price it had just raised.[66]

61. Apple's AppleCare+ business was itself exposed to the tariffs. In May 2025, Cook told investors that an additional 125% tariff on certain Chinese imports, announced in April, applied to "some of our U.S. AppleCare and Accessories businesses," bringing "the total rate in China for these products to at least 145%."[67]

62. On November 6, 2025, at the start of the first holiday season of iPhone 17 sales, Apple reduced the credit it gives consumers who trade in an older iPhone toward a new purchase. Apple cut the maximum trade-in value of nearly every eligible iPhone model. The iPhone 16 Pro fell from $580 to $550, the iPhone 15 Pro from $500 to $400, the iPhone 15 from $400 to $310,

---

[65] Juli Clover, *Apple Raises Monthly AppleCare+ Subscription Price for All iPhones*, MacRumors. February 4th, 2025. Retrieved from: https://www.macrumors.com/2025/02/04/applecare-iphone-price-increase/.

[66] Zac Hall, *AppleCare+ just got more expensive — here's how much more you'll pay now*, 9to5Mac. February 4th, 2025. Retrieved from: https://9to5mac.com/2025/02/04/applecare-just-got-more-expensive-heres-how-much-more-youll-pay-now/.

[67] Apple Inc., *Q2 2025 Earnings Call Transcript*, Published by Seeking Alpha. May 1st, 2025. Retrieved from: https://seekingalpha.com/article/4780879-apple-inc-aapl-q2-2025-earnings-call-transcript.

and the iPhone 13 from $250 to $180.[68] Across its product line, Apple's maximum trade-in values fell by an average of about 20%.[69] A smaller trade-in credit raises the net price a consumer pays for a new device as surely as a higher list price does. It is also one of the methods analysts predicted Apple would use to offset its tariff costs while softening the perception of a price increase.

63. Apple also raised the price of services that carried no import duties. On August 21, 2025, Apple raised the monthly price of its Apple TV+ streaming service, since rebranded Apple TV, by 30%, from $9.99 to $12.99, while leaving the price of the annual subscription unchanged.[70] Upon information and belief, Apple's increases to the prices of its services were part of its recovery of the IEEPA tariff costs it incurred on its imported products, consistent with Apple's spreading of those costs across its products and services.

64. Publicly, Apple denied that its prices reflected the tariffs. On September 19, 2025, the day the iPhone 17 lineup went on sale, Cook told CNBC: "There's no increase for tariffs in the prices to be totally clear."[71] As later reported, "Apple never publicly said that the duties could force it to raise consumer prices."[72]

65. Following the Supreme Court's decision in Learning Resources, Apple moved to recover the tariffs for itself. Apple disclosed that it "has applied for a refund of tariffs paid,

---

[68] Joe Rossignol, *Apple Adjusts Trade-In Values for iPhones, iPads, Macs, and More*, MacRumors. November 6th, 2025. Retrieved from: https://www.macrumors.com/2025/11/06/new-apple-trade-in-values/.

[69] Marcus Mendes, *Apple lowers maximum trade-in values across its entire product line, 9to5Mac*. November 6th, 2025. Retrieved from: https://9to5mac.com/2025/11/06/apple-trade-in-values-2025/.

[70] Benjamin Mayo, *Apple TV+ subscription price increasing to $12.99 per month from today*, 9to5Mac. August 21st, 2025. Retrieved from: https://9to5mac.com/2025/08/21/apple-tv-subscription-price-increase/.

[71] *CNBC Transcript: Apple CEO Tim Cook Speaks with CNBC's Jim Cramer on "Squawk Box" Today*, CNBC. September 19th, 2025. Retrieved from: https://www.cnbc.com/2025/09/19/cnbc-transcript-apple-ceo-tim-cook-speaks-with-cnbcs-jim-cramer-on-squawk-box-today.html); *see also Apple CEO Tim Cook Says iPhone Price Hikes Are Not Tied to Tariffs*, CNBC. September 19th, 2025. Retrieved from: https://www.cnbc.com/2025/09/19/apple-ceo-tim-cook-iphone-price-increase-tariffs.html

[72] Cameron, *Apple Reaps Billion-Dollar Tariff Refund—Will Consumers See Any Benefit?*, supra.

following the processes established by U.S. Customs and Border Protection, and has recognized any refunds received as a reduction of products cost of sales."[73]

66. Apple has already received a substantial refund. Apple reported that its gross margin for the June 2026 quarter "included a favorable impact of approximately 2 percentage points from tariff refunds," and that its diluted earnings per share "included a favorable impact of $0.11 from tariff refunds."[74] On Apple's net sales of approximately $109.4 billion for the quarter, that benefit equates to approximately $2.2 billion,[75] and The Wall Street Journal reported that Apple's refund "has so far reached nearly $2.2 billion."[76] Upon information and belief, Apple has received or expects to receive additional refunds of IEEPA tariffs.

67. Apple intends to keep the refunds. On April 30, 2026, Cook told investors that, "[i]n terms of applying for a refund of tariffs paid, we are following the established processes, and we plan to reinvest any amount we receive back into US innovation and advanced manufacturing."[77]

68. Apple has not established, announced, or offered any process by which Plaintiffs or any Class member may recover the tariff costs they paid.

69. Apple maintains detailed records of its sales in the United States, including Apple Store and online order histories, Apple Account records, device serial numbers, and activation data. Upon information and belief, these records identify the purchaser of each product, the product

---

[73] *Apple Inc., Quarterly Report (Form 10-Q) for the Quarterly Period Ended June 27, 2026*, at 14.

[74] *Apple Reports Third Quarter Results*, Apple Newsroom. July 30th, 2026. Retrieved from: https://www.apple.com/newsroom/2026/07/apple-reports-third-quarter-results/; *see also Apple Inc., Quarterly Report (Form 10-Q) for the Quarterly Period Ended June 27, 2026*, at 16 (attributing increase in products gross margin in part to "tariff refunds").

[75] *See* Rick Orford, *Apple: I Was Wrong, Margin Math Is Now in Its Favor (Rating Upgrade)*, Seeking Alpha September 28th, 2026. Retrieved from: https://seekingalpha.com/article/4950235-apple-i-was-wrong-margin-math-is-now-in-its-favor-rating-upgrade

[76] Theo Francis & Celia Bernhardt, *Tariff Refunds Are Here—and Turbocharging Earnings*, The Wall Street Journal. August 12th, 2026. Retrieved from: https://www.wsj.com/economy/trade/trump-tariff-refunds-company-earnings-1af269a2

[77] *Apple Inc., Q2 FY2026 Earnings Call Transcript*. April 30, 2026. Published by The Motley Fool.

purchased, the price paid, and, through Apple's serial-number and import records, where each unit was manufactured and the tariffs paid upon its importation.

70. Plaintiffs and Class members paid tariff-inflated prices to Apple during the Class Period. Apple now seeks to retain the benefit of those consumer payments while also recovering, and keeping for itself, the refund of the same tariffs.

**D. Defendant Will Receive an Unjust Windfall from IEEPA Tariff Refunds**

71. Following the Supreme Court's decision in *Learning Resource*s, nearly 2,000 importers began attempting to recover tariff refunds from the federal government. On March 5, 2026, the CIT ordered refunds of IEEPA tariffs, holding that "[a]ll importers of record" are "entitled to the benefit" of the Supreme Court ruling that struck down the IEEPA tariffs.[78] The Court ordered CBP to liquidate any and all unliquidated entries subject to IEEPA tariffs "without regard to the IEEPA duties," and ordered that "[a]ny liquidated entries for which liquidation is not final shall be reliquidated without regard to those duties."[79]

72. The Executive Director of CBP's Trade Programs Directorate estimated that as of March 4, 2026, the total amount of IEEPA duties and estimated duty deposits collected pursuant to IEEPA is approximately $166 billion.[80] Defendant's IEEPA tariff refunds are at least $2.2 billion.

73. Despite being well aware of the numerous challenges to the legality of the IEEPA tariffs, Defendant deceived consumers by not informing them that it wouldn't refund duties paid by consumers to cover IEEPA tariffs even if they were later invalidated.

74. These funds were wrongfully taken from consumers to cover IEEPA tariffs that have since been invalidated.

---

[78] *Atmus Filtration, Inc. v. United States*, No. 1:26-01259 (U.S. Ct. Int'l Trade Mar. 5, 2026), ECF 29 at 1.
[79] *Id*. at 3.
[80] Declaration of Brandon Lord, *Atmus*, No. 1:26-01259 (U.S. Ct. Int'l Trade Mar. 6, 2026), ECF 31 at 6.

## V. CLASS ALLEGATIONS

75. Plaintiffs bring this action on behalf of themselves, and as a class action under the Federal Rules of Civil Procedure, Rule 23(a), (b)(2) and (b)(3), seeking damages and injunctive relief pursuant to federal and state law on behalf of the members of the following Class:

a. **Imported Product Subclass**: All persons who, during the period beginning on February 4, 2025 through February 20, 2026, purchased from Defendant a good or service that was itself subject to IEEPA tariffs, at a price that Defendant increased to pass through the IEEPA tariffs assessed on that good.

b. **U.S.-Sourced Product Subclass**: All persons who, during the period beginning on February 4, 2025 through February 20, 2026, purchased from Defendant a U.S.-sourced good or service that was not itself subject to IEEPA tariffs, at a price that Defendant increased to spread, recover, or offset across its product line the IEEPA tariff costs it incurred on its imported goods.

76. Excluded from the Class are Defendant and its officers, directors, management, employees, subsidiaries, or affiliates. Also excluded are the district judge or magistrate judge to whom this case is assigned, as well as those judges' immediate family members, judicial officers and their personnel, and all governmental entities.

77. The identity of all products encompassed within the Class definition, i.e., Class Products, are readily identifiable from Defendant's records. The identity of Class members and their purchase records are available through multiple sources, including Class members' own transaction and payment records, Defendant's records of Class Product purchases, and records maintained by payment processors and financial institutions associated with accepted forms of

payment such as Visa card issuers, debit card providers, credit card companies, banks and mobile payment services.

78. Numerosity. Members of the Class are so numerous that joinder is impracticable. Plaintiffs believes that there are tens of millions of members of the Class (if not more), geographically dispersed throughout the United States, such that joinder of all Class members is impracticable.

79. Typicality. Plaintiffs' claims are typical of the claims of other Class members. The factual and legal bases of Defendant's liability are the same and resulted in injury to Plaintiff and all other members of the proposed Class.

80. Adequate Representation. Plaintiffs will represent and protect the interests of the proposed Class both fairly and adequately. He has retained counsel competent and experienced in complex class-action litigation. Plaintiffs have no interests that are antagonistic to those of the proposed Class, and his interests do not conflict with the interests of the proposed Class members he seeks to represent.

81. Commonality. Common questions of law and fact predominate over questions that may affect only individual Class members because Defendant has acted on grounds generally applicable to the Class and because Class members share a common injury. Determining damages on a class-wide basis is therefore appropriate. The overcharge injuries incurred by Plaintiff and each Class member arose from the same conduct alleged herein.

82. There are common questions of law and fact specific to the Class that predominate over any questions affecting individual members, including:

a. Whether the higher prices that consumers paid for products and services sold by Defendant are attributable to the cost of IEEPA tariffs;

b. Whether Defendant is obligated to return the cost of IEEPA tariffs to the consumers who paid them in the form of higher prices;

c. Whether Defendant's retention of elevated consumer payments constitutes unjust enrichment;

d. Whether Defendant's use of IEEPA tariff-related funds to benefit Defendant's business and political interests was unlawful;

e. Whether Defendant acted unlawfully by upcharging consumers in response to IEEPA tariff-related costs while making statements to the contrary;

f. Whether Defendant's conduct constitutes an unlawful business or trade practice under consumer protection statutes by collecting tariff-related surcharges from consumers while misrepresenting its pricing practices and failing to establish a consumer refund mechanism;

g. Whether Defendant's conduct has harmed Plaintiffs and the Class uniformly; and

h. The measure of damages or restitution available to Plaintiffs and the Class due to increased prices caused by Defendant's IEEPA tariff pass-through.

83. Prevention of inconsistent or varying adjudications: Individual prosecution of the claims alleged herein would likely yield inconsistent or varying results, establishing incompatible standards of conduct for Defendant. Certification of the proposed Class would prevent this outcome.

84. Injunctive Relief. By way of its conduct described in this complaint, Defendant has acted on grounds that apply generally to the proposed Class. Accordingly, final injunctive relief is appropriate respecting the Class as a whole.

85. Predominance and Superiority. A class action is superior to other available means for the fair and efficient adjudication of the Class's claims. The damages suffered by individual Class members are relatively small compared to the burden of individual prosecution of this complex litigation. Individual lawsuits would risk inconsistent judgments and increase delay and expense for all parties. A class action presents fewer administrative difficulties. Class members are ascertainable through methods typical of class action practice, including Defendant's own records and consumers' proof of purchase.

## VI. CLAIMS FOR RELIEF

### COUNT I - UNJUST ENRICHMENT

86. Plaintiffs incorporate by reference all preceding allegations in paragraphs 1 through 85 as though fully set forth herein.

87. Plaintiffs brings this Count on behalf of all Class members.

88. Plaintiffs and the Class have conferred a benefit upon Defendant in the form of money paid through tariff-inflated prices on goods during the period February 4, 2025, through February 20, 2026.

89. Defendant received and accepted that benefit and was thereby enriched. Defendant has retained the benefit conferred by Plaintiff without paying or otherwise compensating Plaintiff for its value.

90. The circumstances surrounding Defendant's receipt and retention of this benefit make it unjust and inequitable for Defendant to retain it without payment to Plaintiffs. Defendant obtained these funds through price increases on goods subject to unlawful tariffs and has retained the resulting profits.

91. Under principles of equity and good conscience, Defendant should not be permitted to retain those ill-gotten profits when Defendant is seeking or must seek a refund of the duties it paid.

92. Plaintiffs and the Class have no adequate remedy at law.

93. Plaintiffs and the Class are entitled to full disgorgement and restitution of any money Defendant has retained as a result of the unlawful and/or wrongful conduct alleged herein.

**COUNT II - MONEY HAD AND RECEIVED**

94. Plaintiffs incorporate by reference all preceding allegations in paragraphs 1 through 85 as though fully set forth herein.

95. Plaintiffs bring this Count on behalf of all Class members.

96. Defendant received funds from Plaintiffs and from each member of the putative Class in the form of an IEEPA tariff surcharge. The Supreme Court has determined that the IEEPA tariffs were unlawful.

97. The funds belonged to Plaintiffs and to each member of the putative Class.

98. Defendant has not returned the funds. Under principles of equity and good conscience, Defendant should not be permitted to retain those ill-gotten funds. Plaintiff seeks the return of the funds in an amount to be proven at trial.

99. Plaintiffs seeks all remedies available under the law, including, if available, actual damages, nominal damages, compensatory damages, punitive damages, and injunctive relief, and other remedies available to them.

**COUNT III - VIOLATION OF THE NEW YORK CONSUMER PROTECTION LAW**
**NY Gen. Bus. Law §349 et, seq.**

100. Plaintiffs incorporate by reference all preceding allegations in paragraphs 1 through 85 as though fully set forth herein.

101. Plaintiffs bring this Count on behalf of all Class members.

102. New York law forbids deceptive conduct or practices in carrying out any business, trade, or commercial activity, as well as in providing services. See N.Y. Gen. Bus. Law § 349.

103. At all relevant times, Defendant engaged in the regular course of trade and commerce in New York by marketing, distributing, supplying and/or selling merchandise to consumers in New York.

104. Defendant unlawfully and unfairly charged customers inflated prices to cover the costs of IEPPA tariffs while representing that Defendant's prices were not increasing in response to the IEPPA tariffs. Defendant also failed to disclose to consumers that it did not intend to seek a refund of IEPPA tariff payments from the federal government even if those tariffs were illegal and instead would use consumers' funds to pursue its own business interests and seek favorable treatment from Trump. This information is material to Plaintiffs' purchasing decisions and if not for Defendant's deceptive and unfair conduct, Plaintiffs and the Class would not have purchased products from Defendant.

105. Defendant's acts complained of herein are a per se violation of the New York Consumer Protection Law §349 as these tariffs were illegal and unlawful.

106. Defendant's practices, as alleged herein, are injurious to the public interest as they have the capacity to injure other persons, including the millions of consumers who shop in Defendant's brick and mortar and/or online stores.

107. Defendant's practices, as alleged herein, injured Plaintiffs and the Class in their business or property.

108. Defendant is liable to Plaintiff for damages in amounts to be proven at trial, including attorneys' fees, costs, and treble damages, as well as any other remedies the Court may deem appropriate under N.Y. Gen. Bus. Law §349.

**COUNT IV - VIOLATION OF THE NEW YORK CONSUMER PROTECTION LAW**
**NY Gen. Bus. Law §350 et, seq.**

109. Plaintiffs incorporate by reference all preceding allegations in paragraphs 1 through 85 as though fully set forth herein.

110. Plaintiffs bring this Count on behalf of all Class members.

111. New York General Business Law §350 provides, in relevant part, that "False advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state is hereby declared unlawful."

112. At all relevant times, Defendant engaged in the regular course of trade and commerce in New York by marketing, distributing, supplying and/or selling merchandise to consumers in New York.

113. Defendant unlawfully and unfairly charged customers inflated prices to cover the costs of IEPPA Tariffs while representing that Defendant's prices were not increasing in response to the IEPPA Tariffs. Defendant also failed to disclose to consumers that it did not intend to seek a refund of IEPPA Tariff payments from the federal government even if those tariffs were illegal and instead would use consumers' funds to pursue its own business interests and seek favorable treatment from Trump. This information is material to Plaintiffs' purchasing decisions and if not for Defendant's deceptive and unfair conduct, Plaintiffs and the Class would not have purchased products from Defendant.

114. Defendant's acts complained of herein are a per se violation of the New York Consumer Protection Law §350 as these tariffs were illegal and unlawful.

115. Defendant's practices, as alleged herein, are injurious to the public interest as they have the capacity to injure other persons, including the millions of consumers who shop in Defendant's brick and mortar and/or online stores.

116. Defendant's practices, as alleged herein, injured Plaintiffs and the Class in their business or property.

117. Defendant is liable to Plaintiffs for damages in amounts to be proven at trial, including attorneys' fees, costs, and treble damages, as well as any other remedies the Court may deem appropriate under N.Y. Gen. Bus. Law §350.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of members of the Class, respectfully requests that the Court enter judgment in their favor and against Defendant, as follows:

A. Certification of the proposed Class, including appointment of Plaintiffs' counsel as Class Counsel;

B. An order temporarily and permanently enjoining Defendant from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged herein;

C. Declaratory relief that Defendant must return to Plaintiffs and the proposed Class all funds paid by consumers to cover an IEEPA tariff surcharge, with interest;

D. Costs, restitution, damages, including statutory, treble, punitive, and nominal damages, and disgorgement in an amount to be determined at trial;

E. An order requiring Defendant to pay both pre- and post-judgment interest on any amounts awarded;

F. An award of costs and attorneys' fees; and

G. Such other or further relief as may be appropriate.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury on all issues so triable.

DATED: October 23, 2026

Respectfully submitted,

**Joseph Mirabelli and Louis Gonzalez, III, Individually and On Behalf of All Others Similarly Situated**

*/s/ Michael J. Fuller, Jr.*______________
Michael J. Fuller, Jr., NYSB # 5239058
**Farrell & Fuller Law**
270 Munoz Rivera Ave. Ste. 201
San Juan, PR 00918
T: 939-293-8244
F: 939-293-8245
mike@farrellfuller.com

*Counsel for Plaintiffs and Proposed Class*